[Civ. No. 50517. First Dist., Div. Two. Apr. 10, 1984.]

JOSEPH MAZZOLA et al., Plaintiffs and Appellants, v.
DIANNE FEINSTEIN, Defendant and Respondent.

COUNSEL

Alioto & Alioto, Joseph L. Alioto, Russell F. Brasso and Judith A. Genovese for Plaintiffs and Appellants.

George Agnost, City Attorney, and John A. Etchevers, Deputy City Attorney, for Defendant and Respondent.

OPINION

ROUSE, Acting P. J.—Plaintiffs, Joseph Mazzola and the labor union of which he was the business manager and financial secretary, Local 38 of the United Association of Journeymen and Apprentices of the Plumbing and

Pipefitting Industry (Local 38), brought this action to recover damages for slanderous statements allegedly made by defendant, Dianne Feinstein, then a member of the Board of Supervisors of the City and County of San Francisco. A lengthy jury trial ensued, and after both sides had rested, the trial court granted defendant Feinstein's motion for a directed verdict in her favor. Judgment on the directed verdict was duly entered, and plaintiffs Mazzola and Local 38 have appealed.

The evidence establishes that plaintiff Mazzola and defendant Feinstein were both public figures in the community when the events resulting in this litigation occurred. In addition to serving as an officer and employee of Local 38, plaintiff Mazzola also served, at various times, as a commissioner with the San Francisco Housing Authority; as a bridge director; as an airport commissioner; and as a member of the California Grand Jury. Defendant was elected to the San Francisco Board of Supervisors in 1969 and remained a member of that body at the time of the alleged slander.

On March 31, 1976, the unionized craft employees went on strike against the City and County of San Francisco. Plaintiff Local 38 was among the striking unions. The strike, which concerned a dispute over wage claims, lasted 38 days, ending on May 8, 1976.

During the course of the strike, defendant heard various reports of vandalism and sabotage. She learned that water mains had been damaged and that the extreme water loss had created a major fire hazard. She read a newspaper article stating that special wrenches had been used to reduce water pressure by tampering with air valves at the San Francisco Airport and that computer cables which controlled the water level in the reservoir had been cut. She also learned that Local 38 had been asked to render emergency assistance in repairing the broken air valves and that the union had refused such assistance. She heard that a major water main had been rendered inoperative when a heavy object was dropped on an air valve located in an obscure area of Golden Gate Park. Defendant formed the opinion that members of Local 38 were probably responsible for sabotaging the air valves at the airport and in the park because she believed that they would be the only persons who had the requisite special wrenches and who knew the location of the valve in the park.

On April 28, 1976, an independent contractor, accompanied by a police escort, repaired the damaged valve in Golden Gate Park. While he was doing so, he was harassed and threatened by pickets, and rocks and paint were thrown. Larry Mazzola, who was the son of plaintiff Joseph Mazzola and the business agent of Local 38, was among the pickets. Defendant saw a telecast of the altercation in the park and recognized Larry Mazzola.

Following the repair of the first damaged air valve in the park, a second air valve in the near vicinity was rendered inoperative by two men who were observed to remove the protective casing around the valve and to throw a rock into the casing. When the independent contractor who had repaired the first damaged air valve refused to repair the second damaged valve, another independent contractor, Joseph Martocchio, was employed to perform this repair work. Mr. Martocchio, who was also provided with police protection, completed the repair on April 28, 1976. For the preceding three days, the Richmond district of San Francisco had been without sufficient water pressure and the fire department had considered the situation so serious that steps had been taken to pump water from various lakes within Golden Gate Park.

On May 6, 1976, Mr. Martocchio was employed to repair an accidentally caused break in a water main located at the intersection of Sutter and Gough Streets. Pickets were present, including Larry Mazzola. On this occasion, Mr. Martocchio was using a pickup truck owned by Peter Annuzzi. Although the license plates and identifying logo on the truck had been covered, the pickets tore off the coverings. In addition, one of the plumbers in the crowd of pickets had attended a plumbing apprenticeship class with Martocchio, and he informed Larry Mazzola of Martocchio's identity.

The strike ended on May 8, 1976, although the City and County of San Francisco had not agreed to all of the union's wage demands.

Two days later, on May 10, 1976, the pickup truck which belonged to Peter Annuzzi and which had been used at the Sutter and Gough water main repair, was parked in front of Martocchio's house, along with a second pickup truck owned by one William Foy. On that date, both trucks were firebombed.

Defendant heard a newscast concerning the firebombing incident on the day it occurred. The newscast mentioned that one of the pickup trucks had been used at the Sutter and Gough repair site. It also stated that the police were questioning labor officials concerning the firebombing.

The agreement which ended the strike provided, inter alia, for the formation of a fact-finding committee (FFC) which would make recommendations to the San Francisco Board of Supervisors concerning wages, hours and other terms of employment. The FFC was to be composed of 11 members. Five were to be appointed by the board of supervisors and five by labor representatives, and Mayor Moscone was to serve as the eleventh member. Defendant was among the five members appointed by the board of supervisors. It was agreed by all members of the FFC that the firebomb-

ing and sabotage incidents which had occurred during the strike were not issues before the FFC, and these issues were never discussed by the FFC at any of its 13 meetings.

The meetings of the FFC were held at the War Memorial Building located across Van Ness Avenue from the San Francisco City Hall. The first meeting was held on May 13, 1976, and as the various members of the committee were walking across Van Ness Avenue, defendant encountered plaintiff Joseph Mazzola and asked him when he was "going to pay for those trucks." When Mazzola asked her what trucks she meant, she replied that she was referring to the trucks "that you burned and bombed." Mazzola again indicated that he did not know what she was talking about, and defendant stated, "Well, if you didn't burn them, your plumbers did, your goons did, and you are the boss. You tell them what to do."

As Mazzola and defendant entered the War Memorial Building, defendant continued to make remarks in the same vein, stating that until Mazzola paid for the trucks, she would not attend any meetings of Local 38. These remarks were overheard by Franz Glen, the FFC representative of the Electricians Union, who interceded and told Mazzola that on May 10, two trucks had been firebombed. As the threesome stood outside the door of the meeting room, defendant, in Glen's presence, again stated that she would not sit and listen to Local 38's presentation until Mazzola or the union had paid for the trucks. She demanded that Mazzola tell her why he had burned or bombed the trucks. When Mazzola denied any involvement in the incident, defendant told him that he was the boss and had ordered the bombing done. She further stated that if Mazzola had not done the bombing, he knew who had and that she had pictures to prove it. Defendant later admitted, in her trial testimony, that she never had any pictures of the firebombing incident.

On June 1, 1976, the day before Local 38 was scheduled to make its presentation to the FFC, Mazzola and defendant were seated across from one another at the meeting room table just prior to the commencement of an FFC meeting. Defendant again asked Mazzola if he was going to pay for the trucks, and she reaffirmed her refusal to listen to Local 38's presentation unless he did so. At the close of the meeting that day, but before leaving the meeting room table, defendant made a similar statement to Robert Dolan, the attorney for Local 38. When Dolan told her that it was her duty to attend Local 38's presentation, she stated, "I am not going to be there until you pay for those trucks that were burned." Defendant repeated this statement to Mazzola, who was standing nearby, and added, "Either you did it or you know who did it."

In addition to Mazzola and Dolan, at least six other individuals present at the June 1 FFC meeting overheard the remarks made by defendant at the close of the meeting.

Immediately after the June 1 meeting, defendant had a conversation with Supervisor Molinari which was overheard by at least three other individuals. Molinari asked defendant if she would be at the FFC meeting scheduled for the following evening. She replied that she would not because she believed that Mazzola and Local 38 were involved in the firebombing of the trucks. When Molinari replied that a man was presumed innocent until proven guilty, defendant stated that she did not care and that she had it on good authority that Local 38 was responsible.

As Mazzola, defendant and Molinari were proceeding toward the elevator following the June 1 meeting, defendant again informed Mazzola that she would not listen to Local 38's arguments "until such time as you or the people who are responsible whom you know make reparation for the burning of the trucks."

Section 950.2 of the Government Code provides, in pertinent part, that "a cause of action against a public employee . . . for injury resulting from an act or omission in the scope of his employment as a public employee is barred" unless a timely claim has been filed against the employing public entity. (See Gov. Code, § 911.2.) ██ It is settled that the filing of a timely claim against the employing public entity is a condition precedent to a tort action against either the public entity or the employee. (*Williams* v. *Horvath* (1976) 16 Cal.3d 834, 838 [129 Cal.Rptr. 453, 548 P.2d 1125]; *Harman* v. *Mono General Hospital* (1982) 131 Cal.App.3d 607, 613 [182 Cal.Rptr. 570].)

██ In this instance, when granting the directed verdict in favor of defendant, one of the grounds upon which the trial court expressly relied was the failure of either plaintiff to file any claim against the City and County of San Francisco. The trial court ruled that, as a matter of law, defendant was acting within the course and scope of her employment as a supervisor when the allegedly slanderous statements were made; hence that plaintiffs' failure to file a claim against her employer, the City and County of San Francisco, was fatal to plaintiffs' slander action against defendant. We agree and find this issue dispositive of the appeal.

In their opening brief on appeal, plaintiffs concede that a duly elected supervisor is an employee for the purposes of section 950.2 of the Government Code, and they also concede that the wrongfulness of an employee's conduct (in this instance the making of slanderous statements) cannot be taken into consideration when determining whether an employee is acting within the scope of his or her employment. However, plaintiffs contend that, in this instance, the trial court erred in concluding that defendant was acting within the scope of her employment as a matter of law. Plaintiffs assert that

the question of whether an employee is acting within the scope of his or her employment at any particular time is one of fact rather than of law, and that the evidence furnishes ample support for a finding that defendant was not acting in the course of her employment as a supervisor when she made the statements which allegedly slandered plaintiffs.

Having thus narrowly defined the question before this court, plaintiffs attempt to marshal the evidence which would support a finding that defendant's participation on the FFC was outside the scope of her employment as a supervisor. Essentially, plaintiffs take the position that a supervisor's powers are limited to those enumerated in the San Francisco Charter and that the board of supervisors is a legislative body which may act only by adopting ordinances or resolutions. Plaintiffs claim that a San Francisco supervisor lacks either express or implied authority to investigate criminal acts occurring within San Francisco or to dictate or interfere with administrative matters such as contracts of employment or compensation. They contend that the FFC was convened solely to make recommendations concerning wages, hours and other terms of the contracts of city and county employees; that it was unnecessary that any member of the FFC be a member of the board of supervisors; and that the FFC was "a mere administrative organization and had absolutely no legislative or policy-making powers." According to plaintiffs' view of the situation, it follows that a member of the board of supervisors is not acting in his or her capacity as a supervisor when serving on a committee such as the FFC; that a member of that committee serves solely as "an FFC representative"; and that it "was purely coincidental that [defendant] was also a supervisor."

This argument is strained, unconvincing and unsupported by any pertinent authority. *Hopper* v. *Allen* (1968) 266 Cal.App.2d 797 [72 Cal.Rptr. 435], the case upon which plaintiffs place their primary reliance, is actually adverse to their position. In that case, a former police officer brought a defamation action against the police chief who had publicly accused him, inter alia, of conspiring against him and lying under oath. (*Id.,* at p. 804.) The trial court rendered a summary judgment in favor of the defendant police chief, holding that the defamation action was barred by the plaintiff's failure to file a claim against the city, since it was clear that the police chief had made the allegedly defamatory statements during the course of his employment. (*Id.,* at p. 799.) ■ In upholding the summary judgment, the appellate court quoted the following established rules defining the course and scope of employment: "'Succinctly stated, an employee is acting in the course and scope of his employment when he is engaged in work he was employed to perform (citations), or when the act is an incident to his duty and was performed for the benefit of his employer and not to serve his own purposes or convenience. As stated in *Payne* v. *Industrial Acc. Com.* [1927]

84 Cal.App. 657, 660 [258 P. 620]: ". . . acts incidental to his regular duties, if of benefit to the employer and not personal to the employee, are within the scope of his employment. . . ."' (*Burgdorf* v. *Funder* [1966] 246 Cal.App.2d 443, 448 [54 Cal.Rptr. 805].)" (*Ibid.*)

In this instance, defendant's participation as a member of the FFC was, at the very least, conduct incident to her duties as a supervisor, undertaken for the benefit of her employer, the City and County of San Francisco, rather than for her own personal reasons. Although plaintiffs stress the fact that the five members of the FFC who were required to be *appointed* by the board of supervisors were not necessarily required to be supervisors, they concede that all five of the appointees were in fact supervisors. In any event, the fact that the board could have appointed an individual who was not a supervisor to the FFC does not establish, as plaintiffs claim, that those supervisors who accepted their appointments to the FFC were thereby exceeding the scope of their employment as supervisors and acting out of personal motives. Obviously, the five supervisors appointed to the FFC quite properly viewed their duties on that committee as incidental to their positions as supervisors.

Likewise, there is no merit to plaintiffs' claim that the derogatory statements which defendant made to and about plaintiffs while she was attending FFC meetings were beyond her powers as a supervisor because she was thereby conducting an unauthorized criminal investigation or attempting to interfere with contracts of employment or compensation. In *Eller Outdoor Advertising Co.* v. *Board of Supervisors* (1979) 89 Cal.App.3d 76, 81-82 [152 Cal.Rptr. 358], the appellate court rejected a similar argument and held that to construe the San Francisco Charter in such a manner as to restrain the supervisors, either collectively or individually, from publicly expressing their views on any matter of civic interest would create an unreasonable restraint on First Amendment rights. In this case it is evident that the 38-day strike which had just ended and which had been so disruptive to the affairs of San Francisco was a matter of civic concern on which defendant, in her capacity as a supervisor, was entitled to comment. Whether she was reasonable or unreasonable in believing that it was essential to resolve the firebombing incident before determining what wages and other conditions of employment to recommend, the fact remains that her comments on the subject were made within the scope of her employment.

Finally, in disposing of plaintiffs' broad assertion that the scope of employment issue presents a question of fact rather than of law, we note that, in the trial court, plaintiffs' counsel repeatedly argued that since there was no dispute as to the precise circumstances under which defendant made the

allegedly slanderous statements, the question of whether she was then acting within the course and scope of her employment was one of law. We agree.

The judgment is affirmed.

Miller, J., and Smith, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 20, 1984.